UNITED STATES BANKRUPTCY COURT    For Publication
SOUTHERN DISTRICT OF NEW YORK
_____

|  |  |  |
|---|---|---|
| | : | |
| In re | : | Chapter 11 |
| | : | |
| ENRON CORP., *et al.*, | : | Case No. 01-16034 (AJG) |
| | : | (Confirmed Case) |
| Reorganized Debtors. | : | |
| | : | |
| | : | |
| _____ | : | |
| | : | |
| ENRON CORP., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Pro. No. 05-01029 |
| | : | |
| AVENUE SPECIAL SITUATIONS FUND II, LP, | : | |
| DK ACQUISITION PARTNERS, LP, | : | |
| RCG CARPATHIA MASTER FUND, LTD., | : | |
| RUSHMORE CAPITAL-I, L.L.C., AND | : | |
| RUSHMORE CAPITAL-II, L.L.C., | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |


OPINION DENYING DEFENDANTS' MOTION TO DISMISS FIRST CAUSE OF
ACTION REGARDING EQUITABLE SUBORDINATION OF CLAIMS
HELD BY DEFENDANTS

A P P E A R A N C E S :

SUSMAN GODFREY L.L.P.
Special Litigation Counsel to the Reorganized Debtors
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096

    H. Lee Godfrey, Esq.
    Kenneth S. Marks, Esq.
    Mary Kathryn Sammons, Esq.
    James T. Southwich, Esq.
      Of Counsel

TOGUT, SEGAL & SEGAL LLP
Attorneys for the Reorganized Debtors
One Penn Plaza, Suite 3335
New York, NY 10119

          Albert Togut, Esq.
          Scott E. Ratner, Esq.
          Richard K. Milin, Esq.
               Of Counsel

ROPES & GRAY LLP
Attorneys for DK Acquisition Partners, LP,
        RCG Carpathia Master Fund, Ltd.,
        Rushmore Capital-I, L.L.C., and
        Rushmore Capital-II, L.L.C.
45 Rockefeller Plaza
New York, NY 10111-0087

          David Elkind, Esq.
          Marc Skapof, Esq.
               Of Counsel

One International Place
Boston, MA 02110-2624

          Matthew M. Burke, Esq.
          Stephen Moeller-Sally, Esq.
               Of Counsel

ALLEN & OVERY LLP
Attorneys for Barclays Bank PLC, and its Affiliates
1221 Avenue of the Americas
New York, NY  10020

          Hugh McDonald, Esq.
               Of Counsel

SULLIVAN & CROMWELL LLP
Attorneys for Barclays Bank PLC, and its Affiliates
125 Broad Street
New York, NY  10004

          David H. Braff, Esq.
          Michael T. Tomaino, Jr., Esq.
          Jeffrey T. Scott, Esq.
               Of Counsel

CRAVATH, SWAINE & MOORE LLP
Attorneys for Credit Suisse First Boston LLC, and its Affiliates
Worldwide Plaza
825 Eighth Avenue
New York, NY  10019-7475

        Richard W. Clary, Esq.
        Julie A. North, Esq.
        Darin P. McAtee, Esq.
           Of Counsel

MAYER, BROWN, ROWE & MAW LLP
Attorneys for Canadian Imperial Bank of Commerce, CIBC Capital Corporation,
      CIBC World Markets Corp., CIBC Capital Corporation,
      CIBC World Markets plc, and CIBC, Inc.
1675 Broadway
New York, NY  10019-5820

        Robert J. Ward, Esq.
        Andrew D. Shaffer, Esq.
           Of Counsel

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorneys for Citibank, N.A.
1285 Avenue of the Americas
New York, NY  10019-6064

        Stephen J. Shimshak, Esq.
        Douglas R. Davis, Esq.
           Of Counsel

SHEARMAN & STERLING LLP
Attorneys for Merrill Lynch & Co. Inc., Merrill Lynch, Pierce, Fenner & Smith, Inc.,
      and Merrill Lynch Capital Services, Inc.
599 Lexington Avenue
New York, NY  10022-6069

        Herbert Washer, Esq.
        William J.F. Roll III, Esq.
        Kristin Fitzmaurice, Esq.
           Of Counsel

SEWARD & KISSEL LLP
Attorneys for Royal Bank of Canada, *et al.,*
One Battery Park Plaza

New York, NY  10004

> Michael J. McNamara, Esq.
> John R. Ashmead, Esq.
> Mark D. Kotwick, Esq.
> Of Counsel

SEWARD & KISSEL LLP
Attorneys for The Bank of New York, as Indenture Trustee
    and Collateral Agent, and Yosemite/CLN Trust
One Battery Park Plaza
New York, NY  10004

> Ronald L. Cohen, Esq.
> John J. Galban, Esq.
> Of Counsel

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
Attorneys for The Bank of New York, as Indenture Trustee
    and Collateral Agent, and Yosemite/CLN Trust
1633 Broadway
New York, NY  10019

> David M. Friedman, Esq.
> Richard F. Casher, Esq.
> Robert M. Novick, Esq.
> Daniel N. Zinman, Esq.
> Of Counsel

McGUIREWOODS LLP
Attorneys for The Toronto-Dominion Bank
1345 Avenue of the Americas
Seventh Floor
New York, NY  10105-0106

> John H. Maddock, III, Esq.
> Of Counsel

Washington Square
1050 Connecticut Avenue, N.W.
Suite 1200
Washington, DC  20036-5317

> Robert Plotkin, Esq.
> Dion W. Hayes, Esq.
> Of Counsel

ARTHUR J. GONZALEZ
United States Bankruptcy Judge

The matter before the Court concerns claims asserted against a bankruptcy estate

that arise out of certain bank loans.  The bank that was the original holder of the bank-

loan claims in issue transferred those claims to third parties.  The transferring bank

allegedly engaged in certain inequitable conduct regarding two prepaid forward

transactions, unrelated to the bank-loan claims, which are currently the subject of a

separate adversary proceeding commenced against several banks.  The issue presented is

whether the bank-loan claims, which were transferred by the original holder of the claims

who is alleged to have engaged in certain inequitable conduct, would be subject to

subordination under section 510(c) of the Bankruptcy Code in the hands of a transferee.[1]

The Court has bifurcated the issue.  The first inquiry is whether section 510(c) of

the Bankruptcy Code grants a court authority to subordinate claims that did not arise from

any misconduct, but were held by a creditor who is found to have engaged in inequitable

conduct regarding the debtor.  The second inquiry is to what extent, if any, a claim

subject to equitable subordination in the hands of a transferor remains subject to equitable

subordination in the hands of a transferee

Regarding the first inquiry, the Court concludes that equitable subordination is not

limited to only those claims related to the inequitable conduct that caused the injury to

the creditor class.  Rather, equitable subordination can apply to claims unrelated to any

inequitable conduct held by the claimant alleged to have engaged in that conduct, limited

---

[1] For purposes of this Opinion, "transferee", unless specifically defined otherwise, refers to any initial
transferee or any immediate or mediate transferee, including subsequent transferees of an immediate
transferee.

by the amount of damages stemming from the inequitable conduct that is not otherwise compensated to that class.

With respect to the second inquiry, the Court concludes that the transfer of a claim subject to equitable subordination does not free such claim from subordination in the hands of a transferee. Rather, a claim in the hands of a transferee, either as an initial transferee or a subsequent transferee, who received that claim from a transferor found to have engaged in inequitable conduct is subject to the same equitable relief, as if, such claim was still held by the transferor. The remedy of equitable subordination remains with the claim. Therefore, a claim in the hands of a transferee is not immunized from subordination even though such transferee may have paid value for such claim and not have engaged in any conduct that would otherwise subject the transferee to the remedy of equitable subordination.

The Court also concludes that the remedy of subordinating claims in the hands of a transferee, not found to have engaged in inequitable conduct, does not contradict the purpose of section 510(c) of the Bankruptcy Code or any provision therein. Rather, it ensures that the purpose of the statute is fulfilled because a creditor, who is found to have engaged in inequitable conduct and harmed its creditor class, would not be permitted to frustrate, hinder, dilute or in any way delay distribution to the other members of the injured creditor class by means of transferring its claims.

Lastly, the Court concludes that the policy underlying the "good faith" defense in various provisions of the Bankruptcy Code does not warrant the extension of such defense to purchasers of claims. Further, the Court finds that a transferee purchasing a post-petition claim cannot avail itself of the "good faith" defense because such transferee

6

is not a purchaser who took without knowledge of potential actions that could be brought

regarding the purchased claims.  Rather, by purchasing claims in a bankruptcy

proceeding, the transferee knows or should know that such claims would be subject to

review and investigation.  The possibility of the commencement of an action by a trustee

or a debtor in possession, who is obligated to prosecute actions in furtherance of the

interests of the estate, including equitable subordination, is one of the assumed risks

attendant to the purchase of a claim.  The possibility of such action is not mere

speculation as may be the case regarding a "good faith" purchaser who by definition

purchases without knowledge that an investigation of property at issue would be

undertaken.  Rather, the purchaser of a claim does so with the knowledge that the estate's

fiduciary *must* examine each claim to determine whether an action, including one based

upon equitable subordination, is warranted.  Further, there is no dispute that such risks

are routinely protected against in transfer documents.  Whether the purchaser of a claim

protects itself is not an issue with which the Court need be involved.

Enron's cause of action based on equitable subordination is sufficient to withstand

a motion to dismiss.  Therefore, Defendants motion to dismiss based upon the alleged

inapplicability of section 510(c) of the Bankruptcy Code to the bank loan claims in the

hands of a transferee is denied.

## FACTS

Commencing on December 2, 2001 (the "Petition Date"), and from time to time

continuing thereafter, Enron Corporation ("Enron") and certain of its affiliated entities,

(collectively, the "Debtors"), filed voluntary petitions for relief under chapter 11 of title

11 of the United States Code (the "Bankruptcy Code").  On July 15, 2004, the Court

entered an Order confirming the Debtors' Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors (the "Plan") in these cases. The Plan became effective on November 17, 2004.

As borrower, Enron entered into a $1,750,000,000 364-day Revolving Credit Agreement (the "Short-Term Credit Agreement"), dated May 14, 2001, and a $1,250,000,000 Long-Term Revolving Credit Agreement (the "Long-Term Credit Agreement"), dated May 18, 2000, (collectively, the "Credit Agreements") with certain participating banks (the "Banks"), among them, Citibank, N.A. ("Citibank") as paying agent, and Citibank and Chase Manhattan Bank ("Chase") as co-administrative agents. Fleet National Bank ("Fleet") loaned Enron $53,666,666.67 as one of the Banks participating in the Short-Term Credit Agreement.

On October 15, 2002, the Court authorized Citibank to file two proofs of claim (Claim Nos. 14196 and 14179) in its capacity as paying agent on behalf of certain creditors, including Fleet, under the Credit Agreements. Citibank sought a consolidated secured claim in the amount of $1,754,024,000, plus unliquidated amounts for the principal and unpaid interest under the Short-Term Credit Agreement and a consolidated secured claim in the amount of $1,253,196,000, plus unliquidated amounts for the principal and unpaid interest under the Long-Term Credit Agreement.

As of the Petition Date, Fleet was the original holder of the claims asserted against Enron's estate (the "Claims"). The Claims were ultimately transferred to Avenue Special Situations Fund II, LP ("Avenue"), DK Acquisition Partners, LP ("DK"), RCG Carpathia Master Fund Ltd. ("RCG"), Rushmore Capital-I, L.L.C. ("Rushmore I") and Rushmore Capital-II, L.L.C. ("Rushmore II") (collectively, the "Defendants").

On August 22, 2002, Fleet sold to Avenue $10 million of principal amount of the

Claims under the Short-Term Credit Agreement.  On October 24, 2002, Fleet sold to

Credit Suisse First Boston ("CSFB") $29.5 million of principal amount of the Claims

under the Short-Term Credit Agreement.  On March 12, 2002, Rushmore I acquired from

Goldman Sachs Credit Partners $10 million of principal amount of the Claims originally

held by Fleet under the Short-Term Credit Agreement.  On May 25, 2002, Rushmore II

acquired from Chase $2.75 million of principal amount of the Claims originally held by

Fleet under the Long-Term Credit Agreement.

On November 27, 2002, CSFB sold to RCG $5 million of principal amount of the

Claims under the Short-Term Credit Agreement.  On December 3, 2002, CSFB sold to

Avenue $10 million of principal amount of the Claims under the Short-Term Credit

Agreement.  On March 12, 2003, CSFB sold to DK $14.5 million of principal amount of

the Claims under the Short-Term Credit Agreement.

On September 23, 2003, Enron commenced an adversary proceeding (the

"Megacomplaint Proceeding", Docket No. 03-09266) against the Banks.  On December

1, 2003, April 30, 2004, June 14, 2004 and January 10, 2005, Enron filed the first,

second, third and fourth amended complaints in the Megacomplaint Proceeding,

respectively.  In the fourth amended complaint, Enron named Fleet as one of the principal

banks in certain preference and fraudulent conveyance claims relating to two series of

prepaid forward transactions, the so called "December 2000 Mahonia Pre-pay

Transaction" and "Project Bacchus," into which Fleet and the entity organized by Fleet

had been brought as participants by Chase and Citibank, respectively.  In that complaint,

Enron alleges that Fleet and the entity organized by Fleet received partial repayments of a

05-01029-ajg    Doc 35    Filed 11/17/05    Entered 11/17/05 15:52:26    Main Document
Pg 10 of 53

portion of the more than $171 million which they had paid as part of these two transactions, and that these partial repayments allegedly constituted preferences or fraudulent conveyances. Enron further alleges that Fleet benefited from its inequitable conduct, including its aiding and abetting Enron in engaging in accounting fraud, that resulted in injury to Enron's creditors and conferred an unfair advantage on Fleet. Enron asserts that as a consequence of Fleet's alleged misconduct, the general unsecured creditors were misled as to Enron's true financial condition, induced to extend credit without knowledge of Enron's actual financial situation, and, as a result, are less likely to recover fully on their claims.

Moreover, in the Megacomplaint Proceeding or in this adversary proceeding, Enron does not allege that there was any fraudulent or unlawful conduct under the Credit Agreements, or that any payments of principal or interest with respect to the loans under the Credit Agreements constitute preferences or fraudulent conveyances. Further, Enron did not repay any portion of the loans under the Credit Agreements to the Banks prior to the Petition Date.

On January 12, 2005, Enron commenced this adversary proceeding, seeking to subordinate and disallow the Claims held by Fleet in the Megacomplaint Proceeding as of the Petition Date against the Debtors' estate, and subsequently transferred to and asserted by the Defendants. In the complaint filed in this adversary proceeding (the "Complaint"), Enron seeks relief based on two causes of action. The first is based on the principles of equitable subordination. The second is based on the disallowance of claims or interests under section 502(d) of the Bankruptcy Code. The second cause of action is not addressed by this Opinion.

10

With respect to the first cause of action, Enron asserts that under section 510(c) of

the Bankruptcy Code, the Claims would have been subordinated for purposes of

distribution, and any liens securing the Claims would have been transferred to Enron's

estate, had the Claims not been transferred from Fleet to the Defendants.  Enron contends

that the Claims should be subordinated to the same extent as if Fleet had continued to

hold the Claims, and any liens securing the Claims should be transferred to Enron's

estate.

On May 18, 2005, the Defendants[2] filed a motion to dismiss the adversary

proceeding, pursuant to Federal Rule of Bankruptcy Procedure ("Fed. R. Bankr. P.")

7012(b) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6), for failure to

state a claim (hereinafter, references to the Defendants only include the moving

defendants).  The Defendants contend that the sole basis of the cause of action asserted

by Enron against the Defendants is that Fleet, not the Defendants, allegedly received

preferences or fraudulent conveyances from Enron, or engaged in inequitable acts in the

two prepaid forward transactions that are unrelated to the Claims stemming from Credit

Agreements.  No allegation is made in the Complaint that any of the Defendants engaged

in improper or unlawful conduct, or received any preferences or fraudulent conveyances.

Further, no allegation is made that the Credit Agreements were part of any fraudulent

conduct.  Thus, the Defendants conclude that the Claims should not be subject to

subordination because, pursuant to section 510(c) of the Bankruptcy Code, the party

---

[2] Avenue answered the Complaint on April 1, 2005.  In its answer, Avenue stated that Enron's Complaint
should be dismissed based on its failure to state a claim upon which relief may be granted.  However, the
Court's review of the docket of this adversary proceedings reveals that Avenue did not move or join with
other Defendants to dismiss Enron's Complaint by the motion before the Court.  Therefore, Avenue is not a
moving defendant in the motion.

whose claims are subordinated must have engaged in inequitable conduct causing injury

to the creditors or the estate.

Pursuant to section 1109(b) of the Bankruptcy Code and the Court's Coordinated

Scheduling and Intervention Order (the "Scheduling Order"), dated April 27, 2005,

Barclays Bank PLC, Canadian Imperial Bank of Commerce, Citibank, N.A., CSFB,

Merrill Lynch & Co., Inc., Royal Bank of Canada and The Toronto-Dominion Bank

submitted a memorandum of law, dated July 15, 2005, in support of the Defendants'

motion to dismiss the adversary proceeding. Additionally, pursuant to the Scheduling

Order, The Bank of New York as Indenture Trustee and Collateral Agent for Yosemite

Securities Trust I and Yosemite Securities Company, Ltd., together with Enron Credit

Linked Notes Trusts submitted a memorandum of law in support of the Defendants'

motion to dismiss filed in the Coordinated Actions.[3]

A hearing on this matter was held before the Court on August 9, 2005.

## DISCUSSION

Fed. R. Civ. P. 12(b)(6) is incorporated into bankruptcy procedure by Fed. R.

Bankr. P. 7012(b). In considering a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure

to state a claim for relief, a court accepts as true all material facts alleged in the complaint

and draws all reasonable inferences in favor of the plaintiff. *Walker v. City of New York*,

974 F.2d 293, 298 (2d Cir. 1992). A motion to dismiss is granted only if no set of facts

can be established to entitle the plaintiff to relief. *Id.*

---

[3] Under the Scheduling Order, the term "Coordinated Actions" is defined to include certain adversary proceedings regarding financial institutions and their transferees, including the Defendants. By that order the adversary proceedings are coordinated before the Court for the purposes of adjudicating the issues raised in any motion to dismiss, motion on the pleadings, motion for summary judgment or for partial summary judgment in connection therewith.

In considering such a motion, although a court accepts all the factual allegations in the complaint as true, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Thus, where more specific allegations of the complaint contradict such legal conclusions, "[g]eneral, conclusory allegations need not be credited." *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995). Rather, to withstand a motion to dismiss, there must be specific and detailed factual allegations to support the claim. *Friedl v. City of New York*, 210 F.3d 79, 85-86 (2d Cir. 2000).

"Although bald assertions and conclusions of law are insufficient, the pleading standard is nonetheless a liberal one." *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998). Pursuant to Fed. R. Civ. P. 8(a), which is made applicable to adversary proceedings by Fed. R. Bankr. P. 7008, in asserting a claim, the pleader need only set forth a short and plain statement of the claim showing that the pleader is entitled to relief. The purpose of the statement is to provide "fair notice" of the claim and "the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The simplicity required by the rule recognizes the ample opportunity afforded for discovery and other pre-trial procedures, which permit the parties to obtain more detail as to the basis of the claim and as to the disputed facts and issues. *Id*. at 47-48. Based upon the liberal pleading standard established by Fed. R. Civ. P. 8(a), even the failure to cite a statute, or to cite the correct statute, will not affect the merits of the claim. *Northrop v. Hoffman of Simsbury, Inc.*, 134 F.3d 41, 46 (2d Cir. 1997).

In reviewing a Fed. R. Civ. P. 12(b)(6) motion, a court may consider the allegations in the complaint; exhibits attached to the complaint or incorporated therein by

reference; matters of which judicial notice may be taken; *Brass v. Am. Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); and documents of which plaintiff has notice and on which it relied in bringing its claim or that are integral to its claim. *Cortec Indus. Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). However, mere notice or possession of the document is not sufficient. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). Rather, a necessary prerequisite for a court's consideration of the document is that a plaintiff relied "on the terms and effect of a document in drafting the complaint." *Id*. As such, the document relied upon in framing the complaint is considered to be merged into the pleading. *Id*. at 153 n.3 (citation omitted). In contrast, when assessing the sufficiency of the complaint, the court does not consider extraneous material because considering such would run counter to the liberal pleading standard which requires only a short and plain statement of the claim showing entitlement to relief. *See* Fed. R. Cir. P. 8(a), *Chambers,* 282 F.3d at 154. Nevertheless, in considering a Fed. R. Civ. P. 12(b)(6) motion, a court may consider facts as to which the court may properly take judicial notice under Rule 201 of the Federal Rules of Evidence ("Fed. R. Evid."). *In re Merrill Lynch & Co., Inc.*, 273 F. Supp. 2d 351, 383 n.3 (S.D.N.Y. 2003)(citing, *Chambers*, 282 F.3d at 153).

To survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them. *Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999). A court's role in ruling on a motion to dismiss is to evaluate the legal feasibility of the complaint, not to undertake to weigh the evidence, which may be offered to support it. *Cooper*, 140 F.3d at 440 (citations omitted).

Thus, for the purposes of the Motion to Dismiss, the Court accepts as true all of the material allegations in the Plaintiff's complaint. Further, for purposes of this motion, the Defendants do not dispute any of the factual allegations regarding Fleet. The focus of the Defendant's motion is that, even if such allegations were true, the cause of action for equitable subordination fails as a matter of law.

*Parties' Contentions*

Enron argues that the Claims should be subject to subordination on the ground that the equitable doctrine under section 510(c) of the Bankruptcy Code warrants the subordination of the Claims and that the Claims that would have been subject to subordination as of the Petition Date should remain subject to subordination thereafter. Enron further argues that the purchasers of the Claims should have protected themselves by demanding indemnities rather than by seeking to limit a debtor's rights. In addition, Enron contends that a judicial holding that the Claims cannot be subordinated based on the transferor's conduct would render section 510(c) of the Bankruptcy nugatory. Enron argues that the consequence of such a holding would encourage wrongdoers to "wash" their claims in order to escape from subordination. Enron argues that, as a result, such a holding would be contrary to public policy and congressional intent under the Bankruptcy Code. Finally, Enron argues that the good faith of the transferee is irrelevant because the focus here is on the conduct of the original holder of the Claims under section 510(c) of the Bankruptcy Code.

Pursuant to Fed. R. Civ. P. 12(b)(6), incorporated into bankruptcy procedure by Fed. R. Bankr. P. 7012(b), the Defendants move to dismiss the Complaint as a matter of law based upon their contention that equitable subordination applies to a creditor who is

found to have participated in inequitable conduct, not to the particular claim at issue. Specifically, the Defendants argue that, under the plain language of section 510(c) of the Bankruptcy Code, subordination does not follow the claim, but serves to punish claimants who are found to have acted inequitably. They assert that the conduct of one party is not imputed to another for purposes of equitable subordination.

Further, in response to Enron's argument that the good faith of a transferee is irrelevant, the Defendants assert that the conduct of one party is not imputed to another for purposes of equitable subordination. The Defendants cite section 550(b) of the Bankruptcy Code, which provides that when the initial transferee of a debtor's property transfers such property to a third party, a trustee may not recover the debtor's property from that subsequent transferee if the subsequent transferee purchased the property in good faith. The Defendants assert that Congress did not intend to punish a good faith purchaser. In addition, the Defendants assert that as a matter of public policy under the Bankruptcy Code, equitable subordination is not warranted where a good faith and innocent purchaser acquired a claim for fair value without knowledge of the alleged wrongful conduct by the seller or the transferor.

The Defendants also assert that the inclusion of indemnity provisions in privately negotiated contracts does not imply that section 510(c) of the Bankruptcy Code should apply, nor does it imply that Congress intended to require private parties to negotiate indemnities. In addition, the Defendants direct the Court's attention to the fact that, in the instant case, Enron has sought a remedy against Fleet in the Megacomplaint Proceeding. The Defendants maintain that Fleet is a solvent financial institution that will be bound by any judgment requiring it to return allegedly avoidable or preferential

transfers and to correct the wrongdoing by having its claims, arising out of the two

prepaid forward transactions with the principal amount of $171 million, subordinated.  As

a result, the Defendants contend that the Claims should not be subject to equitable

subordination.  In any event, the Defendants argue that Congress did not set up a

statutory regime which allows them to be sued.

      As a matter of public policy, the Defendants argue that a judicial holding that a

good faith transferee can be subject to equitable subordination solely on the basis of the

transferor's conduct and long after the initial bankruptcy petition was filed would both

introduce multiple layers of litigations against subsequent innocent transferees, and

seriously and needlessly impact liquidity in the market for post-petition transfers of

claims.  Further, the Defendants argue that such a holding would contradict congressional

intent to exempt good faith transferees, as evidenced by section 550(b) of the Bankruptcy

Code.

      In opposition to the Defendants' motion to dismiss, Enron asserts that the

Defendants' arguments lack merit.  Enron asserts that its position is based on equitable

principles, not on the holding of any particular case cited by it.  Further, Enron asserts

that the innocence of a purchaser of a post-petition claim is not relevant to a

determination of whether a claim is subject to subordination.  Rather, Enron contends that

the focus is on the seller's misconduct based on the analysis of the equitable doctrine.

According to Enron, under the equitable doctrine, if misconduct by the holder of the

Claims as of the Petition Date (i.e., Fleet) is established, that is sufficient to justify

subordination.  Enron maintains that a contrary ruling would encourage "claim washing"

by allowing wrongdoers to profit at the expense of the estate creditors who are

unprotected.

*Equitable Subordination*

The issue is whether the Claims transferred by the original holder, Fleet,

ultimately to the Defendants, are immunized from equitable subordination under section

510(c) of the Bankruptcy Code.  As stated previously, in order to make that

determination, the Court bifurcates the issue.  The first inquiry is whether section 510(c)

of the Bankruptcy Code grants a court authority to subordinate claims that did not arise

from any misconduct, but were held by a creditor who is found to have engaged in

inequitable conduct regarding the debtor.  The second inquiry is to what extent, if any, a

claim subject to equitable subordination in the hands of a transferor remains subject to

equitable subordination in the hands of a transferee.  In addition, the Court will determine

whether the Defendants can assert by analogy the "good faith" defense under section

550(b) of the Bankruptcy Code to immunize the Claims from subordination.

Section 510(c)(1) of the Bankruptcy Code provides that, after notice and a

hearing, the court may -

> under principles of equitable subordination, subordinate for
> purposes of distribution all or part of an allowed claim to all or part
> of another allowed claim or all or part of an allowed interest to all
> or part of another allowed interest. . .

11 U.S.C. § 510(c)(1).

It has been well established that a bankruptcy court can subordinate an allowed

claim based on the equitable doctrine and the application of that doctrine is left to the

discretion of the court.  The equitable doctrine is applied where conduct is alleged

18

whereby a creditor injured other claimants and obtained unfair advantage over such
claimants.

Section 510(c) of the Bankruptcy Code "adopts the long-standing judicially
developed doctrine of equitable subordination under which a bankruptcy court has power
to subordinate claims against the debtor's estate to claims it finds ethically superior under
the circumstances." *Allied E. States Maint. Corp., et al. v. Miller* (*In re Lemco Gypsum,
Inc.*), 911 F.2d 1553, 1556 (11th Cir. 1990) (citations omitted).  A bankruptcy court can
exercise its power when the following three elements are satisfied

    (1)  the claimant must have engaged in some type of inequitable conduct,
    (2)  the misconduct must have resulted in injury to the creditors or conferred an unfair
         advantage on the claimant, and
    (3)  equitable subordination of the claim must not be inconsistent with the provisions
         of the Bankruptcy Act.

*Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir. 1977)
(citations omitted).

Courts have broad discretion in applying subordination based upon inequitable
conduct.  The *Mobile Steel* court concluded that the inequitable conduct need not be
related to the acquisition or assertion of the claim.  *Id*.  "Improper acts unconnected with
the acquisition or assertion of a particular claim have frequently formed at least a part of
the basis for the subordination of that claim." *Id.* at 700-01 (citation omitted).  However,
a bankruptcy court can subordinate a claim only to the extent necessary to offset the harm
suffered by the bankrupt and its creditors on account of that conduct.  *Id.* at 701.  The
three-prong test set forth in *Mobile Steel*, a proceeding under Chapter XI of the
Bankruptcy Act, 11 U.S.C. §§ 701 *et seq.* (1970), has been used in the context of
applying the equitable subordination doctrine under the Bankruptcy Code.  The Court

finds that the *Mobile Steel* test is the applicable standard under the Bankruptcy Code and

has applied this test in determining equitable subordination. *See Official Comm. of*

*Unsecured Creditors v. Morgan Stanley & Co., Inc., et al. (In re Sunbeam Corp.),* 284

B.R. 355, 363 (Bankr. S.D.N.Y. 2002). Under the test, equitable subordination applies to

the extent necessary to remedy the otherwise uncompensated harm or unfair advantage.

*Id.*

In addition, "bankruptcy courts are empowered [by the common law concept of

the equitable doctrine] to subordinate claims where the subordination will promote a just

and equitable distribution of the bankruptcy estate." *Trone v. Smith* (*In re Westgate-*

*California Corp.),* 642 F.2d 1174, 1177 (9th Cir. 1981) (citation omitted).

The language of section 510(c) of the Bankruptcy Code affords a court's

discretion when it considers subordination of claims based on the common law concept

of the equitable doctrine. The Supreme Court has held that a bankruptcy court, pursuant

to its equitable power, always had the authority to subordinate an allowed claim in order

to assure "that fraud will not prevail, that substance will not give way to form, that

technical consideration will not prevent substantial justice from being done." *Pepper v.*

*Litton*, 308 U.S. 295, 305 (1939). In *Pepper v. Litton,* the Supreme Court noted that the

basis for the rule of equitable subordination is that "the bankruptcy court has the

[equitable] power to sift the circumstances surrounding any claim to see that injustice or

unfairness is not done in administration of the bankrupt estate.'' *Id.* at 308 (citations

omitted). The purpose of section 510(c) of the Bankruptcy Code is to correct inequitable

conduct and ensure no creditor gain an unfair advantage in the distribution of the estate.

Based on these principles set forth by the Supreme Court, it is within the court's discretion to determine whether claims can be subject to equitable subordination. The Fifth Circuit held that "a bankruptcy court is entitled . . . to determine how and what claims are allowable for bankruptcy purposes, in order to accomplish the statutory purpose of advancing a ratable distribution of assets among the creditors." *Addison v. Langston (In re Brints Cotton Mktg, Inc.),* 737 F.2d 1338, 1341 (5th Cir. 1984) (citations omitted). The Supreme Court affirmed that the purpose of the Bankruptcy Act is "to provide for the conservation of the estates of insolvents to the end that there may be as equitable a distribution of assets as is consistent with the type of claims involved." *Simonson v. Granquist*, 369 U.S. 38, 40 (1962).

When applying the equitable doctrine, a court will consider other factors, including administrative convenience and the delay of a bankruptcy proceeding. Case law also directs a court to consider the grounds of "historical considerations of equity and administrative convenience," as well as "the broad equitable principle that creditors should not be disadvantaged vis-à-vis one another by legal delays attributable solely to the time-consuming procedures inherent in the administration of the bankruptcy laws." *Brints Cotton Mktg,* 737 F.2d at 1341 (citations omitted). Courts are required to consider administrative convenience and the fundamental principles of equity that creditors of a bankruptcy estate should not be disadvantaged because of the law's delay. *Nicholas,* 384 U.S. at 689.

While a bankruptcy court can apply the equitable doctrine at its discretion, nevertheless, the power to subordinate an allowed claim is not boundless and courts cannot use equitable principles to disregard unambiguous statutory language of the

Bankruptcy Code. The Supreme Court in *United States v. Noland* held that ". . . [t]he circumstances that prompt a court to order equitable subordination must not occur at the level of policy choice at which Congress itself operated in drafting the Code." 517 U.S. 535, 543 (1996) (citing *Stebbins v. Crocker Citizens Nat'l Bank* (*In re Ahlswede*), 516 F. 2d 784, 787 (9th Cir. 1975), which noted that "the [equity] chancellor never did, and does not now, exercise unrestricted power to contradict statutory or common law when he feels a fairer result may be obtained by application of a different rule")). The Supreme Court held that "[w]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206-07 (1988). The application of the *Mobile Steel* test ensures that the full breath of the remedy of equitable subordination is available while ensuring that its reach does not violate any provision of the Bankruptcy Code or become punitive as opposed to remedial.

Therefore, if the *Mobile Steel* test is established, the equitable doctrine provides broad legal and policy grounds to subordinate claims to ensure that a debtor's estate can receive the full breath of the remedy of equitable subordination that arises from the misconduct. Accordingly, equitable subordination is warranted if its absence would frustrate the statutory purpose of advancing equitable distribution among creditors.

I.    *Equitable Subordination of Claims Unrelated to Inequitable Conduct*

The first inquiry is whether section 510(c) of the Bankruptcy Code grants a court authority to subordinate claims that did not arise from any misconduct, but were held by a creditor who is found to have engaged in inequitable conduct regarding the debtor.

22

The proposition that a bankruptcy court can subordinate any claim held by a creditor found to have engaged in inequitable conduct to achieve a "just" result for the debtor's estate is consistent with the second prong of the *Mobile Steel* test, in which a claim can be subordinated to the extent necessary to offset the harm arising from the inequitable conduct to the bankrupt's estate or its creditors. *Mobile Steel,* 563 F.2d, at 701. The *Mobile Steel* court found that when a court considers equitable subordination of a claim, the inequitable conduct does not have to be related to such claim to justify the subordination. *Id.* at 706.[4] In setting forth the first-prong of the *Mobile Steel* test, that court stated that "[i]mproper acts unconnected with the acquisition or assertion of a particular claim have frequently formed at least a part of the basis for the subordination of that claim." *Id.* at 700-01 (citation omitted). It found "no case in which a federal court refused to subordinate a claim solely because, although inequitable conduct of sufficient magnitude to warrant subordination existed, the conduct was unrelated to the acquisition or assertion of the particular claim whose status was at issue." *Id.* The Court has not found any case thereafter that would alter that proposition. Instead, the Court finds that case law supports that proposition in *Wilson v. Huffman*, 818 F.2d 1135, 1146 (5th Cir. 1987) (noting that "[a claimant's claim] could be subordinated on the basis of [the inequitable] conduct [by another person with whom such claimant had a partnership relationship], notwithstanding the court's finding that [such claimant] himself committed no overt acts of misconduct").

---

[4] The Court has not found any support for the proposition that under section 510(c), the claim that is subordinated *must* directly or indirectly arise from inequitable conduct. Thus, it follows that even if none of the claims held by that claimant are directly or indirectly related to the inequitable conduct attributable to the claimant, the unrelated claims may still be subordinated. Fundamentally, the analysis focuses on the alleged inequitable conduct, and any associated harm therefrom, not on any particular claim or group of claims.

Additionally, in *Westgate-California*, the bankruptcy court initially ordered subordination of all of the claims held by the claimant, including claims unrelated to inequitable conduct.[5]  On subsequent motion, however, the bankruptcy court modified the order to subordinate only the claims involving inequitable conduct.  *Westgate-California*, 642 F.2d at 1176.  On appeal, the district court ordered the subordination of all claims held by the defendant, not limited to the claims involving misconduct.  *Id*.  The Ninth Circuit reversed, finding that because the harm by the defendant could be remedied by subordinating claims related to inequitable conduct, the subordination of all of the defendant's claims was punitive.  *Id*. at 1174-79.  Thus, the Ninth Circuit remanded the case to the district court to reconsider its order.  *Id*. at 1179.[6]

Significantly, the Ninth Circuit did not find, or even suggest, that section 510(c) of the Bankruptcy Code restrains courts from subordinating claims unrelated to the misconduct at issue.  The *Westgate-California* court reasoned "a claim will not be subordinated unless it is shown that the claimant has acted inequitably *in the course of his relationship with the debtor* and that those actions have harmed the debtor or his other creditors in some way."  *Id*. at 1178 (citations omitted) (emphasis added).  Thus, that court at first found that the claimant had committed inequitable acts in the course of the claimant's relationship with the bankrupt, and then determined "whether those acts justify subordination of all of [such claimant]'s claims."  *Id*. at 1177.

_____

[5] In *Westgate-California*, the claimants had two categories of the claims in dispute – claims for money for decoration services and claims for furniture.  *Westgate-California*, 642 F.2d at 1175.  Only claims for furniture involved the inequitable conduct, including fraud, conversion, breach of fiduciary duty and falsification of records.  *Id*. at 1176-77.
[6] A dissenting judge found that the subordination of all of the defendant's claims was warranted because "This was not a single act of inequitable conduct but it is wrongdoing so pervasive and so damaging to the bankrupt that no court governed by equitable principles should permit the defendant to share in the assets of a bankrupt corporation on a parity with other creditors and stockholders."  *Id*. at 1179.

In determining that issue, the *Westgate-California* court focused on the extent of the otherwise uncompensated injury from the inequitable conduct, and did not discuss or infer that there should be any other limitation on the application of the remedy. It found that "[b]ankruptcy courts are empowered to subordinate claims where subordination will promote a just and equitable distribution of the bankruptcy estate." *Id.* at 1177 (citation omitted). It recognized that "subordination is a means of regulating distribution results in bankruptcy by adjusting the order of creditors' payments to the equitable levels of their comparative claim positions . . . ." *Id.* (citation omitted). It further recognized that [subordination's] "fundamental aim is to undo or to offset any inequity in the claim position of a creditor that will produce injustice or unfairness to other creditors in terms of the bankruptcy results." *Id.* at 1177 (citations omitted). Limiting subordination only to those claims related to the inequitable conduct would unnecessarily deprive the aggrieved creditors of the full benefit of the remedy of equitable subordination, when the uncompensated injury caused by such claimant exceeds the amount of those claims. Such limitation would frustrate the court's ability to ensure a just and fair distribution of the bankruptcy estate.

The limitation for subordination of a claimant's claims is simply that ". . . the court ought not to subordinate where the value of the claim greatly exceeds the amount of damage that the claimant has inflicted by his inequitable conduct." *Id.* at 1178 (citation omitted). The *Westgate-California* holding set the boundary for the remedy of equitable subordination by stating that "[b]ankruptcy courts must take care not to subordinate claims where doing so will operate only to penalize the claimant." *Id.* That court recognized that

> . . . [the power of subordination] should not operate to take away anything
> punitively to which one creditor is justly entitled in view of the liquidation
> finality, and bestow it upon others, who in the relative situation have no
> fair right to it. It can therefore ordinarily go no farther than to level off
> actual inequitable disparities on the bankruptcy terrain for which a creditor
> is responsible, to the point where they will not create unjust disadvantages
> in claim positions and liquidation results.

*Id.* (citations omitted).  It did not limit the remedy only to the claims related to

inequitable conduct, but, as previously stated, set the boundary as the amount of

otherwise uncompensated damages resulting from the inequitable conduct.  The line

between the remedy of equitable subordination and the imposition of a penalty is only

crossed where the amount that is subordinated is greater than the otherwise

uncompensated injury suffered by the other members of the injured creditor class.

Further, the court in *Mobile Steel* illustrated the extent to which subordination is

proper in noting that where "a claimant guilty of misconduct *asserts two claims*, each

worth $10,000, and the injury he inflicted on the bankrupt or its creditors amounted to

$10,000, only one of his claims should be subordinated."  *Mobile Steel,* 563 F. 2d at 701

(emphasis added).  That illustration did not indicate whether both claims were related to

any inequitable conduct, but simply set forth the principle that the remedy is limited to

the extent of injury.  However, the *Mobile Steel* court's statement that inequitable

conduct does not have to be related to such claims to justify subordination, *Id*. at 706,

supports the conclusion that the remedy of equitable subordination can be applied against

claims not related to any inequitable conduct.

Regarding which claims the remedy should be applied to first, the *Westgate-
California* analysis and the *Mobile Steel* discussion support the view that subordination

should be applied against the claim related to the inequitable conduct in the first instance,

and then, be against the unrelated claims to the extent necessary to remedy the remaining
otherwise uncompensated injury.  The Court notes that this may not be the only
methodology for applying the remedy of equitable subordination.  However, it is not
necessary to determine the appropriate methodology, or methodologies, for applying the
remedy in this Opinion.

Finally, "[s]ubordination is an equitable power and is therefore governed by
equitable principles." *Westgate-California,* 642 F.2d at 1177.  Bankruptcy courts are
empowered by this common law concept of the equitable doctrine to subordinate claims
where the subordination will promote a just and equitable distribution of the bankruptcy
estate.  No case has specifically limited a court's exercise of this equitable doctrine to the
subordination of claims only related to the inequitable conduct where the uncompensated
injury exceeded the amount of the claims related to the inequitable conduct.

Generally, courts have dealt with the subordination of claims related to
inequitable conduct.  Nonetheless, the legal principles of subordination and the case law,
as discussed above, support the conclusion that a court can subordinate a claim unrelated
to the inequitable conduct when it is necessary to provide the other members of the
injured creditor class the full benefit of the remedy for the injury resulting from the
claimant's misconduct.  This conclusion conforms with public policy underlying the
Bankruptcy Code that a court can exercise its authority to subordinate a claim in order to
rectify the harm to the estate or its creditors and achieve a fair distribution to creditors.  If
Congress had intended to limit equitable subordination to only those claims directly
related to the inequitable conduct, it would have manifested such intent.

27

In conclusion, equitable subordination may reach any claim necessary to effectuate the remedy set forth in section 510(c) of the Bankruptcy Code limited only by the extent of otherwise uncompensated injury to the related creditor class. Therefore, equitable subordination is not limited to only those claims related to the inequitable conduct. Subordinating any amount of claim in excess of the established injury sustained would be punitive, and not consistent with the principles of equitable subordination nor permissible. However, limiting the remedy of subordination to the claims related to the inequitable conduct could deprive the estate or the injured creditors of the full benefit of the section 510(c) remedy, and as well, would not be consistent with the principles of equitable subordination. Further, such a holding would confer an unfair advantage on certain groups of claimants who engage in misconduct over the other members of the injured creditor class and frustrate a fundamental purpose of the Bankruptcy Code to achieve a just and fair distribution of the estate.

II.    *Application of Equitable Subordination to Transferred Claims*

As previously set forth, the Claims are not related to the inequitable conduct alleged against Fleet; however, having found that a court can subordinate claims under section 510(c) of the Bankruptcy Code unrelated to the inequitable conduct, the Court must now determine whether such claims remain subject to equitable subordination in the hands of any transferee to the same extent that they would have been subject to subordination in the hands of the transferor. The Debtors argue that the transfer of a claim should have no impact on the issue of the application of the remedy of equitable subordination against such claim, if that claim would have been subject to subordination in the hands of the transferor. The Defendants argue that section 510(c)(1) of the

Bankruptcy Code does not permit the imputation of a transferor's inequitable conduct to

a transferee for purposes of equitable subordination.[7]

There is no basis to find or infer that transferees should enjoy greater rights than

the transferor. On the contrary, case law has affirmed the principle that under a

bankruptcy proceeding, "[a]n assignee stands in the shoes of the assignor and subject to

all equities against the assignor." *Goldie v. Cox*, 130 F. 2d 695, 720 (8th Cir. 1942)

(citing *Fidelity Mut. Ins. Co., v. Clark*, 203 U.S. 64, 74 (1906)). The *Goldie* court found

that "[u]nless these claims (or at least enough of them to satisfy the assignment) can be

allowed to claimant, the assignee would fare likewise." *Id.* The legal effect of the claim

---

[7] The Court notes that the cases cited by the Defendants to support their proposition do not concern a transferor-transferee relationship. For example, one cited case discusses a principal-agent relationship, stating that an individual owner's misconduct is not imputed to a corporation entirely owned by such owner without further findings concerning the existence of a principal-agent relationship and alter ego. *Westgate-California Corp. v. First Nat'l. Fin. Corp.*, 650 F.2d 1040, 1043-44 (9th Cir. 1981) (noting that subordinating a corporation's claims was not justified based on the inequitable conduct of an individual owner of this corporation, without finding that such owner acted as the agent of this corporation when he committed the inequitable conduct and without finding the corporation was the owner's alter ego so as to justify the disregard of this corporation's separateness as a corporate entity). In *Westgate-California Corp.*, the corporation's claims were never held and transferred by such individual owner to the corporation. The claims belonged to the corporation, a separate entity from the owner of the corporation. In the instant matter, the transferor-transferee relationship is central. The obligations of the claims traveled from the transferor (i.e., Fleet) to the transferees (i.e., the Defendants) (additional discussion follows in the text).
  In addition, the Defendants cite *Wilson v. Huffman* to support their argument that an assignor's alleged bad conduct can only be imputed to the assignee where the assignee was aware or somehow implicated in the wrongdoing at issue. In *Wilson v. Huffman,* because a claimant was the principal of the partnership formed by such claimant and another partner and involved in the partnership's transactions, the court found that such claimant's claims could be subordinated on the basis of his partner's identifiable inequitable conduct. 818 F.2d at 1146. The Defendants seek to rely on a comment made by the *Wilson v. Huffman* court in positing a hypothetical where the court stated

> we do not express an opinion on a hypothetical case in which a note is some way passed by an inequitable actor to an innocent uninvolved bystander. In that hypothetical situation, one which is not presented in this case, there *might* be reasons to find that subordination of a note would be contrary to the principles of equitable subordination as they have developed in the court. (Emphasis added).

*Id.* However, the *Wilson v. Huffman* court's statement concerning the hypothetical is dicta and not controlling here or persuasive, as that court did not conduct an analysis of a transferor-transferee relationship. Further, although there *might* be reasons not to apply subordination in the hypothetical described, as discussed throughout this opinion, the equitable considerations based upon the circumstances set forth herein, warrants a finding that a claim that would be subject to equitable subordination in the hands of the transferor should be subject to subordination to the same extent in the hands of any transferee. (additional discussion follows in the text).

is not to extinguish the underlying obligation of the claim, but assign it to the transferee.

*See Dorr Pump & Mfg. Co. v. Heath et al. (In re Dorr Pump & Mfg. Co.)*, 125 F.2d 610,

611 (7th Cir. 1942).  The transfer of a claim does not change the nature of the claim

against the transferor.  *See Carnegia v. Georgia Higher Educ. Assistance Corp.,* 691 F.2d

482, 483 (11th Cir. 1982).  The Second Circuit confirmed that an assignee succeeds to all

the rights of the assignor.  *See Citibank, N.A. v. Tele/Resources, Inc.,* 724 F.2d 266, 269

(2d Cir. 1983).

In addressing the impact of a transfer on the statutory priority of a claim, the

Supreme Court held that the assignment of a claim cannot change the priority of such

claim for wages under the Bankruptcy Act (July 1, 1898).  *See Shropshire, Woodlife &*

*Co. v. Bush et al.,* 204 U.S. 186, 189 (1907).  In a case decided under the Bankruptcy

Code, the Fifth Circuit affirmed the principle set forth by *Shropshire* and indicated that,

unless there is clear legislative intent in the Bankruptcy Code itself not to allow the

transferees to stand in the shoes of the transferors, the transferees' position does not

change by the transfer.  *See Wilson v. Brooks Supermarket, Inc., (In Re Missionary*

*Baptist Found. of Am.),* 667 F.2d 1244, 1247 (5th Cir. 1982).  In *Missionary Baptist*, the

court noted as follows

> [a]t least, in the absence of indicia of a legislative intent to overrule the
> sound policy reflected by these decisions, we adhere to the rationale of the
> pre-1978 decisional law that accorded the same priority to claims based on
> assignments by the wage earner as to claims for wages made by the wage
> earner himself.

*Id.*  Thus, the Fifth Circuit found that the priority of a claim is not altered by its transfer

to another.

The remedy of subordination is authorized under section 510(c) of the Bankruptcy Code, pursuant to which a court may exercise its equitable power consistent with common law principles to adjust the order of payments to creditors to achieve equitable levels of distributions based upon their comparative claim positions. Therefore, although the aforementioned case law addresses statutorily defined priority issues, there is no reason not to apply the same principles under that case law to the issue before the Court. It follows that the priority of a claim resulting from equitable subordination should not be impacted by a transfer. Once it is established that a claim in the hands of the transferor would be subject to subordination, such claim in the hands of a transferee should fare no differently. Rather, it should be subordinated to the same extent that such claim would be subject to equitable subordination in the hands of the transferor. The purchase of the claims in a bankruptcy proceeding should not grant a transferee any greater rights than the transferor had. The risks inherent in bankruptcy proceedings are merely shifted to another who stands in the shoes of the original or previous claimant.

Such determination is consistent with the policy consideration and the three-prong test concerning equitable subordination judicially developed by the *Mobile Steel* court. 563 F.2d at 700; *see also Sunbeam,* 284 B.R. at 362-63. In order to determine whether equitable subordination applies, the Court will first consider the alleged misconduct according to the first prong of the *Mobile Steel* test. However, no case has limited such consideration in the context of a transferred claim to only the conduct of the current holder. The Defendants argue that section 510(c) of the Bankruptcy Code only applies to claimants engaged in inequitable conduct, not to claims. According to the Defendants, because of the absence of a finding concerning the Defendants' misconduct, the first

prong of the *Mobile Steel* test cannot be satisfied. As a result, the Claims cannot be

subject to subordination. The Court disagrees and finds that the equitable subordination

analysis is not solely limited to consideration of the conduct of the current claimholder.

The Supreme Court answered the issue of whether the right to an assigned claim

for wages attaches to the claimant or to the claim. *See Shropshire,* 204 U.S. at 188. In

*Shropshire*, the Supreme Court made clear that "if [the right to an assigned claim for

wages attaches] to the person, it is available only to him, if to the claim, it passes with the

transfer to the assignee." *Id.* It concluded that the right to an assigned claim for wages

attaches to the debt, and not to the person of the creditor; to the claim, and not to the

claimant. It reasoned that bankruptcy law does not "expressly" or "by fair implication"

state that the right to a claim for wages must be due to the claimant at the time of the

presentment of the claim, and thus, restricting the right to the claimant was not warranted.

*Id*. at 189.

The principle set forth by *Shropshire* can be applied to the instant case. Section

510(c) of the Bankruptcy Code does not "expressly" or "by fair implication" state that

subordination only applies to the original claimant. By examining the plain language of

the statute, only "claim" rather than "claimant" is mentioned under section 510(c)(1) of

the Bankruptcy Code, which provides that a court may "under principles of equitable

subordination, subordinate for purposes of distribution all or part of an allowed *claim* to

all or part of another allowed *claim* or all or part of an allowed interest to all or part of

another allowed interest." 11 U.S.C § 510(c)(1) (emphasis added). Had Congress meant

for the application of equitable subordination to be limited to an original claimant or a

32

claimant at the time of the presentment of the claim, rather than the "claim" itself, it would have provided such limitation.

Thus, the adjustment of priority of a claim resulting from subordination is attached to such claim and it travels with any subsequent transfer. The transfer of a claim subject to subordination in the hands of the original holder does not extinguish the claim's susceptibility to subordination. Rather, that legal effect is transferred to such transferees. Thus, the subsequent transferees are subject to equitable subordination as such relief could have been sought against an original claimant who engaged in misconduct.

Apart from the legal analysis set forth above, the Court also considers the policy arguments advanced by both parties. Enron argues that the consequences of shielding transferred claims from subordination would be detrimental to the Debtors' estates and to the other members of the injured creditor class who could not protect themselves against the transfer of bankruptcy claims. One of the consequences would be to encourage the creditors, who have engaged in inequitable conduct, to "wash" the claims free of any possibility of equitable subordination by simply transferring them. Enron argues that if the wrongdoers were allowed to sell their claims free of the risk of subordination, they would unfairly benefit from their wrongs.

In response to Enron's arguments, the Defendants contend that there is no evidence to support Enron's allegation that Fleet would have an incentive to "dump" the claims in the claims-trading market at the discounts that the trading market demands. Further, the Defendants urge the Court not to stretch the coverage of the statute to deal with the policy concern of "claim washing" because there is no evidence in the body of

jurisprudence dealing with claims-transfers, in any study, nor in any law review that suggests that "claim washing" is an actual "real world" problem.

The Defendants maintain that Enron has a remedy available to rectify the previous claimholder's inequitable conduct, in that Enron may pursue the previous claimholder for recovery. Applying this procedure, however, would require a debtor to make distributions to all current claimholders, including the transferee who holds a challenged claim. That debtor would then be required to recover damages for the inequitable conduct from the original holder of the claim who engaged in inequitable conduct. In contrast, the procedure proposed by Enron allows a debtor to refrain from making any distribution on account of any claim arising from misconduct, unless and until the injured creditor class is fully satisfied.

Here, the Court focuses on the policy ramifications resulting from a judicial holding that would place the burden on a debtor's estate to recover the funds distributed on the claims subject to subordination from the original holders of the claims, instead of simply not distributing any funds on such claims to the current claimholders until other class claimants are paid in full. The Court does not speculate as to the extent to which the unavailability of the remedy of subordination of claims would provide alleged wrongdoers with an incentive to engage in "claim washing." Nor does the court question that the financial institutions that are alleged to have engaged in inequitable conduct may well have independent business reasons[8] to transfer claims to third-party investors.[9]

---

[8] It has been noted that claim sellers transfer claims to avoid the administrative hassle and costs of bankruptcy proceedings; or to establish a tax loss on their investment; or meet the regulatory requirements, including Basel Accord capital requirement, auditing rules for balance sheet asset write-offs or mark-to-market accounting requirements for securities. *See* Paul M. Goldschmid, *More Phoenix than Vulture: The Case for Distressed Investor Presence in the Bankruptcy Reorganization Process*, 191 COLUM. BUS. L. REV. 192, 206-07 (2005).

However, there is no doubt that a party from which the estate would have to recover damages relating to equitable subordination would be in a superior position than a party to which the estate could simply, if otherwise warranted, subordinate its claim. Burdening of the estate with the necessity of collecting damages to effectuate the remedy of equitable subordination would undermine the remedy itself.

As the Court mentioned previously, the Court must ensure that the purpose of the bankruptcy statute is achieved. Thus, a creditor who is found to have engaged in inequitable conduct should not be permitted to frustrate, hinder, dilute or in any way delay the distribution to the other members of the injured creditor class by means of transferring its claims. The Court is concerned that if a debtor were forced to pursue the transferor, it would defeat the goal of section 510(c) of the Bankruptcy Code, and at a minimum, hinder, dilute or frustrate the distribution. The Court disagrees with the Defendants' proposition that they should not be sued for subordination because Enron has a remedy against Fleet, a solvent institution which would be bound by any judgment issued by the Court. Whether the transferor is solvent is irrelevant. The remedy under section 510(c) of the Bankruptcy Code is intended to apply without the debtor having to engage in a collection effort. If the Defendants' approach were adopted, a debtor would have to continuously monitor the transfer of claims and the solvency of the original transferor. There is no basis to burden the estate with such monitoring.[10]

---

[9] In addition, the Court recognizes that the existence of a market to transfer claims is commonly viewed to provide a source of liquidity to the original or subsequent holders of the claims, including financial institutions that provide pre-petition loans to the debtors.

[10] Further, the conclusion that flows from Defendants' argument is that if the transferor were not solvent, that a transferee, who pays value, would then become subject to equitable subordination. This argument has no support in case law or any principles discussed in Defendants' arguments. If followed, this approach would result in a remedy that would be nearly impossible to effectuate and result in enormous administrative costs by requiring constant monitoring by the debtor of the financial condition of claimholders. Further, this argument is fundamentally inconsistent with the "good faith" defense analogy

In the current claims-transfer market, claims are often transferred several times, and the ultimate holder of the original claims is the end transferee in a multiple-transfer chain. Practically, regardless of whether the prior holders are solvent, if the remedy of subordination of such claims in the hands of a transferee were not available to the debtor, the estate would be administratively burdened by having to pursue original holders to recover any amount paid on the claims that would have been subordinated in the hands of the prior holders.

With the availability of the remedy of subordination of the claims against the transferees, the estate can withhold the funds in connection with these claims from its reserve and distribute them to the creditors. Otherwise, in order to "claw back" those funds for distribution to creditors, the estate would be forced to initiate collection lawsuits against each of the original or previous holders who engaged in inequitable conduct. As a result, the litigation process would not only prolong the time required to collect these funds for distribution to the creditors, but also would create uncertainty concerning recovery of these funds for the estate. Unavoidably, the consequence of being unable to subordinate claims in the hands of transferees would delay the ultimate distributions by the debtor, which delay is contrary to the goal of the Bankruptcy Code.

Further, in addition to placing an administrative burden on the estate, the Defendants' approach would have a compound effect on the distribution. Not only would the creditors be subject to a delay in the distribution process but also, unless funds in excess of the amount due from the claimant subject to equitable subordination are recovered from the wrongdoers, the creditors would not receive the same amount in

---

argued by Defendants, as discussed in section III. It is inconsistent because it would result in the transferee's liability being dependent upon the solvency of the transferor – a test that would have nothing to do with a transferee who pays value.

distribution that they would have had the transferee's claims been treated as if they were

still in the hands of the transferor.  Thus, in order to fully rectify the harm arising from

the misconduct to the estate and its creditors, the estate would have to recover a greater

amount than would have been distributed to the transferee claimant.[11]   The consequence

---

[11] The following example illustrates the consequences of each party's treatment of a claim in the hands of a subsequent transferee.  A hypothetical estate has $200 of value to distribute to its creditors.  Five creditors (the "Creditors") hold claims against the estate valued at $100 each (together, the "Claims"), for an aggregate total of $500 in claims against the estate.  One of the Claims in the hands of the transferor ("Transferor"), however, was subject to equitable subordination (the "Tainted Claim").  Under the approach advocated by Enron, the Tainted Claim would remain subject to equitable subordination, regardless of any subsequent transfer that took place.  The transferee of the Tainted Claim (the "Transferee") would be ineligible to receive a distribution, leaving the four remaining other members of the creditor class (the "Innocent Creditors") to share *pari passu* in the $200 value of the estate.  Each Innocent Creditor would therefore receive a total distribution of $50.  Thus, if the Tainted Claim were subject to equitable subordination in the hands of the Transferee, distributions would be made as follows

| | |
|---|---|
| Assets available for distribution | $200 |
| Number of claims, including Tainted Claim | 5 |
| Number of tainted claims | 1 |
| Amount of each claim | $100 |
| Number of claims to receive distributions | 4 |
| Pro rata distribution* to each of the claimants, except the Tainted Claim | $ 50 |
| Distribution to Tainted Claim | $  0 |
| Total distribution to each | $ 50 |
| Total distributions (4 X $50) | $200 |

*The mechanics of the distribution model is that the subordinated claim receives a constructive pro rata distribution ($200/5 = $40) as if the claim were not subject to subordination.  Then, that constructive amount ($40) is returned to the estate and, thereafter, the pro rata distribution is made to the (4) claimants not subject to subordination ($200/4 = $50).  The Court notes that under the Enron Plan, the mechanics of the distribution is far more complex, but the principles and consequences set forth herein are equally applicable.

  Under the approach put forth by the Defendants, the Tainted Claim would not be subject to equitable subordination in the hands of a good faith transferee.  Thus, each of the four Innocent Creditors and the Transferee would share *pari passu* in the $200 estate, with each receiving $40 on their claims.  The burden would then be placed on the debtor to pursue an action against the Transferor of the Tainted Claim to recover the distribution to the Transferee.  This $40 recovery would then be distributed among the five claimants, with each receiving an additional $8.00 on their claims.  Since each claimant would receive a total of $48, the Innocent Creditors would receive $2.00 less than what would be received under the course of action advocated by Enron.  This, of course, assumes that a full recovery could be made against the Transferor, and does not factor in the legal costs, among other things, that would be incurred by the debtor's estate in the process.  Therefore, if the Tainted Claim were not subject to equitable subordination in the hands of the Transferee, distributions would be made as follows

| | |
|---|---|
| Assets to be distributed by first distribution | $200 |
| Number of claims | 5 |
| Number of claims to receive distributions, including Tainted Claim | 5 |
| Amount of each claim | $100 |

would place unwarranted additional burdens on those creditors who were already harmed

by the inequitable conduct.  Further, even if a full recovery were received, delay would

be unavoidable.

Lastly, the Defendants contend that a judicial determination that the Claims

should be subordinated would seriously and needlessly undermine confidence in the

system of post-petition transfers and impact the liquidity of the market for post-petition

transfers of claims.  They further argue that the consequence of allowing subordination of

the Claims in the hands of the Defendants would create uncertainty and be burdensome to

the general transferees.  They base this argument on the fact that the banks are involved

| | |
|---|---|
| Number of claims not receiving a distribution | 0 |
| Pro rata distribution to each of the claimants under first distribution | $ 40 |
| | |
| Thereafter, the debtor must seek to recover the amount of the distribution paid to the transferee on the Tainted Claim.  If recovered, that amount is paid into the estate available and made available for distribution as follows | |
| | |
| Assets recovered from transferor/available for distribution | $ 40 |
| Pro rata distribution to each of the claimants under second distribution | $  8 |
| Total distribution to each claimant, including transferee | $ 48 |
| Total distributions (5 X $48) | $240 |

  Under the Defendant's approach, an Innocent Creditor would receive less on their claim, and would therefore be deprived of the full benefit available under section 510(c) of the Bankruptcy Code.  Thus, in order for the Innocent Creditors to recover the full benefit that would have been available had the claim not been transferred, the debtor would have to recoup (1) litigation costs, (2) any loss of value resulting from the delay in distribution, and (3) the $2.00 difference in the pro rata distribution that resulted from distributions being made to five, as opposed to four, creditors.  Additionally, it would be the estate that would ultimately bear the risk of recovery against the transferor, as well as related costs.  If recovery were unsuccessful, not only would the Innocent Creditors lose the benefit of equitable subordination, they would also suffer the additional consequences of the fees and expenses incurred in the unsuccessful recovery process.  Such a burden is not contemplated by section 510(c) of the Bankruptcy Code, and would not arise if a claim in the hands of a transferee remained subject to equitable subordination.
  Regarding the amount of damage resulting from inequitable conduct, in *Citicorp Venture Capital, Ltd. v. Comm. of Creditors* (*In re Papercraft Corp*.), 323 F.3d 228, 234 (3d Cir. 2003), the court concluded that costs arising from a claimant's misconduct, such as related litigation and administrative costs, can be included in the damage calculation.  Whether the damage calculation can include costs, other than related litigation and administrative costs, such as those discussed above, is an issue that would have to be addressed if Defendant's approach were adopted.  Further, although the consequences of the Defendants' approach may be addressed by way of settlement with the transferor, nonetheless, the burden of those consequences, including litigation risks, improperly placed upon a debtor in that process.

in hundreds of transactions with a debtor, therefore, as a practical matter, it would be

impossible for them to conduct due diligence on all transactions in which they purchase

claims.

Participants in the claims-transfer market are aware, or should be aware of, the

risks and uncertainties inherent in the purchase of claims associated with post-petition

debtors, including the possibility of claims being subordinated, and they assume the

liabilities arising from the post-petition transfer of claims.  As noted by the Supreme

Court in *Fidelity Mut. Life Ins.,* the transferees are subject to the equities existing at the

time of the transfer.  203 U.S. at 74.  The purchase of a claim, itself, evidences the

transferee's willingness to assume the risks attendant to a bankruptcy proceeding (see

more related policy arguments in Section III of this Opinion).  The risk that full recovery

may not be available is a risk factor that must be assessed by a purchaser.[12]

Moreover, in order to protect the interests of both transferors and transferees, the

industry has promulgated standardized provisions relating to transferred rights, assumed

obligations, buyer's rights and remedies.  *See* LSTA Standard Terms and Conditions on

the Purchase and Sale Agreement for Distressed Trades (the "Distressed Trades

---

[12] The Court notes that the risk of buying claims in a bankruptcy proceeding has been identified in the
distressed debt industry for at least a decade.  "As a general legal principle, an investor who purchases a
distressed claim enjoys the same 'rights and disabilities' as the original claimholder."  *See* Stuart C. Gilson,
*Investing in Distressed Situations: A Market Survey.*  FINANCIAL ANALYSTS J. 8, 10 (November-
December 1995).  This article was contained in the material provided to attendees at the Distressed
Investing seminar in 2004 where Prof. Gilson was a participant on a panel entitled – Valuation Workshop:
Distressed Airlines.  In the article, Prof. Gilson warned that a post-petition claim-purchaser inherits
liabilities, including equitable subordination from the original transferor that such transferee had no role in
creating.  *Id.* at 15.  "In Chapter 11, an investor in distressed debt risks having the debt 'equitably
subordinated' – made less senior – if the selling creditor is found to have engaged in 'inequitable conduct'
that resulted in harm to other creditors or gave the selling creditor's claim an unfair advantage in the case."
*Id.* at 16.  "As a result of these considerations, investors who are more familiar with the borrower's
operations and management (e.g., as a result of past business dealings or superior research) have an
increasing comparative advantage in assessing these risks and in accurately valuing distressed claims."  *Id.*

Agreement") published by the Loan Syndications and Trading Association, Inc.[13]   More

importantly, the Defendants, although not addressing the extent to which they are

protected under the indemnification clause of the transferred agreements between the

transferors and the transferees, acknowledge that there are provisions in the transfer

agreements that relate to the consequences of a claim not being paid.[14]

      To eliminate such risks by providing special protection to the purchasers of claims

subject to subordination in the hands of a transferor would create a "special" class of

claimholders.  The creation of such a special class would have no support in the

Bankruptcy Code or case law.  It is the role of Congress to provide special protection to

claims' transferees to the extent it determines that the need to afford such protection to

them would outweigh the additional burden placed on the estate and the other members

of the injured creditor class to receive the intended benefit of section 510(c) of the

Bankruptcy Code.  Additionally, if wrongdoers were allowed to profit by selling their

---

[13] Under section 4, the seller warrants that the claims are "free and clear" of any encumbrance.  *See* Purchase and Sale Agreement for Distressed Trades published by the Loan Syndications and Trading Association as of May 1, 2005; attached to the Declaration from Richard K. Milin.  Specifically, under section 4.1 (w)(ii), "[S]eller represents and warrants to Buyer that Seller has not received any written notice other than those publicly available in the Bankruptcy Case (if any) or otherwise, that the Transferred Rights, or any portion of them, are void, voidable, unenforceable or subject to any Impairment."  *Id.*  "Impairment" means "any claim, counterclaim, setoff, defense, action, demand, litigation . . . right (including expungement, avoidance, reduction, contractual or *equitable subordination*, or otherwise)."  *Id.* (emphasis added).  Under section 6, "Seller shall indemnify, defend, and hold Buyer and its officers, directors, agents, partners, members, controlling Entities and employees harmless from and against any liability, claim, cost. Loss, judgment, damage or expense . . . that any Buyer Indemnitee incurs or suffers as a result of, or arising out of (1) a breach of any of Seller's representations, warranties, covenants or agreements in this Agreement . . . . "  Further, under section 6(1)(a) the buyer is entitled to indemnification from the seller if condition, including disallowance and subordination, results in buyer's receiving proportionately less in payments or distribution or less favorable treatment than other *parri passu* creditors.  *Id.*  Under section 5(f), the buyer of the distressed claims warrants himself to understand and assume the risks arising from the purchase of the claims.  *Id.*

[14] The Court notes that because of the availability of the indemnification remedy under the transfer agreement, UBS A.G. ("UBS") initiated an action (Docket No. 05-01061) against a prior claim holder, IntesaBci, S.P.A., who entered into a transfer agreement with UBS, for indemnification of the loss on disallowance and subordination of the claims arising from the alleged misconduct by Toronto Dominion Bank, a defendant under the Megacomplaint Proceeding.  Attached to the Declaration from Richard K. Milin.

claims, then the other members of the injured creditor class would effectively be forced

to share their recoveries from the debtor's estates with the wrongdoers, and be forced to

engage in litigation seeking recovery of damages resulting from the consequences of the

transfer.

When one balances the harm to the other members of the injured creditor class as

against the risks to a claim-purchaser, the interests of the other members of the injured

creditor class prevail. A claim-purchaser, by definition, engages in a high-risk

transaction with a number of risks, including the potential for equitable subordination of

the claim. Allowing a claim-purchaser to prevail would be inconsistent with public

policy, as the Court mentioned previously. Therefore, the equitable doctrine provides

another basis for the Court to subordinate any claims in the hands of the transferees[15] if

the three-prong *Mobile Steel* test is established as to the transferor.

In conclusion, the Court holds that the transfer of a claim does not shield such

claim from equitable subordination in the hands of a transferee. The Court determines

that the application of equitable subordination is not solely limited to the claimant who is

---

[15] The Defendants also argue that not all categories of debt, such as bonds, are traded in the claims-transfer marketplace where the trading parties are free to negotiate representations, warranties, indemnities and other protection devices. The purchase of bonds and notes are not at issue before the Court in the instant proceeding. However, the Court notes that the post-petition purchaser of such debt instruments either knows or should know that the issuer of these securities is a debtor, so the prices of these transfers would reflect the attendant risks that the claims might be subordinated. Under those circumstances, the purchaser may well not have any available indemnity remedy against the seller, as is the case with the claims trading. But it is the market place that should address such risks in its pricing. Apprehending higher risk associated with these securities, the purchaser may demand further discounts on the prices. And based on the Court's previous policy analysis, no legal and policy basis supports the premise that transferees of bonds or notes should be treated differently than those holding the transferred loan claims. All the post-petition transferees assume the risk that their claims may be subject to subordination (see additional policy arguments in section III of this Opinion).

Further, a party who enters into a pre-petition agreement under which such party agrees to accept a transfer of proofs of claim in the event of the bankruptcy of a party to such agreement, should fair no better that a post-petition purchaser of claims. By agreeing to accept the transfer of claims, a party assumes the same risks, including that the transferor engaged in conduct that could result in equitable subordination of the transferee's claims, as a purchaser of claims.

found to have engaged in the conduct that is the subject of an equitable subordination

complaint.  Rather, any transferee is subject to all equitable relief sought against the

claimant whose conduct would warrant the finding of equitable subordination.  Simply,

the equitable relief available under the doctrine of equitable subordination remains with

the claim.  Any other result would be contrary to the purpose of the Bankruptcy Code not

to hinder or dilute the distribution of funds by the estate or possibly foreclose the

prospect of a debtor's recovery.  Therefore, if the Court determines that the otherwise

uncompensated injury caused by Fleet would have reached the Claims had they remained

in the hands of Fleet, then the Claims in the hands of the Defendants, as transferees

would be subject to subordination as if the Claims were still held by Fleet,

notwithstanding a finding that the Defendants did not engage in any misconduct.  Further,

the equitable doctrine supports the proposition that there is no basis to distinguish the

treatment of a claim in the hands of the transferee from its treatment in the hands of the

transferor prior to the transfer.

III.    *"Good Faith" Defense*

        The Defendants argue that even if equitable subordination applies to the Claims,

as innocent transferees, they are entitled to assert a "good faith" defense.  Under the third

prong of the *Mobile Steel* test, subordination of a claim must be consistent with the

provisions of the Bankruptcy Code.  *Mobile Steel,* 563 F.2d at 700.  This element is "a

reminder to the bankruptcy court that although it is a court of equity, it is not free to

adjust the legally valid claim of an innocent party who asserts the claim in good faith

merely because the court perceives that the result is inequitable."[16]  *Noland,* 517 U.S. at

---

[16] *Noland* holds that a court's discretion in applying equitable subordination under section 510(c) of the
Bankruptcy Code is not limitless.  517 U.S. at 535.  In *Noland*, the court reversed the lower courts'

539 (citations omitted).  "[T]he circumstances that prompt a court to order equitable

subordination must not occur at the level of policy choice at which Congress itself

operated in drafting the Code."  *Id.* at 543.

Here, the Defendants do not argue that subordination of the Claims would be

inconsistent with any provision of the Bankruptcy Code.  Rather, they contend that the

policy underlying various provisions of the Bankruptcy Code that deal with avoided

transfers, in particular section 550 of the Bankruptcy Code, protects "good faith"

transferees.  Section 550 of the Bankruptcy Code prevents a trustee from recovering the

transferred property from a transferee who pays value, in good faith and without

knowledge of the voidability of the transfer at issue, or any immediate or mediate good

faith transferee of such transferee.[17]  The Defendants acknowledge that the language of

section 510(c) of the Bankruptcy Code does not explicitly provide for a "good faith"

---

affirmation of a bankruptcy court's decision that modified the priorities set forth by Congress by denying
administrative expense priority to a post-petition tax penalty.  *Id.*  Simply, a valid claim that is asserted in
good faith cannot be subordinated, as such subordination would be inconsistent with the priority scheme
established by Congress.  *Id.* at 539-41.  The instant case can be distinguished from *Noland.*  In *Noland*, the
term good faith is referenced in the context of the assertion of the claim by its original holder.  *Id.* at 539.
Additionally, there was no dispute that the claim was asserted in good faith; as a result, the court in *Noland*
did not further discuss the application of good faith under section 510(c) of the Bankruptcy Code.  More
importantly, in the instant case, except for the Defendants' good faith policy argument by analogy to
section 550 of the Bankruptcy Code, it is clear that equitable subordination of the Claims would not be
inconsistent with any provision of the Bankruptcy Code established by Congress (additional discussion
follows in the text).

[17] Section 550(a) of the Bankruptcy Code provides that ". . . the trustee may recover, for the benefit of the
estate, the property transferred . . . the value of such property, from -
    (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
    (2) any immediate or mediate transferee of such initial transferee."
 Section 550(b) provides that "[t]he trustee may not recover under section (a)(2) of this section from -
    (1)  a transferee that takes for value, including satisfaction or securing of a present or antecedent
        debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
    (2)  any immediate or mediate good faith transferee of such transferee.
11 U.S.C. §550(a) and (b).  The Court notes that there is a limitation on the trustee's right to recover
property from certain subsequent transferees under section 550(b).  "The scope of subsection (b) does not
include an initial transferee under subsection (a)(2) of the debtor or an agent of the debtor even if the initial
transferee takes in good faith and for present fair equivalent value."  *See* 5 Collier on Bankruptcy, ¶ 550.03,
at 22.

defense for a transferee of a claim.[18]   However, the Defendants contend that the "good

faith" defense under section 550(b) of the Bankruptcy Code should be extended to

purchasers of claims.    They argue by analogy that section 550 of the Bankruptcy Code

supports their view that Congress did not intend to punish a good faith transferee of a

claim by applying equitable subordination to the transferred claim.  Essentially, the

Defendants argue that not allowing such defense would be inconsistent with the policy

underlying the various provisions of the Bankruptcy Code that permit a "good faith"

defense by a transferee.

       In the instant case, the Defendants maintain that they acted in good faith and paid

fair value for in the purchase of the Claims.  They further claim that there is no dispute

that the Defendants did not engage in any misconduct in the post-petition purchase of the

Claims.  Finally, the Defendants assert that they acted in good faith, as their purchases

were made more than one year before the Megacomplaint Proceeding was filed.

Therefore, they contend that they had no knowledge of any allegations asserted in the

pending Megacomplaint Proceeding when they purchased the Claims.  The Defendants

argue that they have established a "good faith" defense and therefore, the cause of action

based upon equitable subordination should be dismissed.

       With respect to the Defendants' argument seeking the extension of the "good

faith" defense under section 550(b) of the Bankruptcy Code to the claims-transfer

process, the Court finds that such extension is not warranted.  Section 550 of the

---

[18] Other than the reference to the term good faith mentioned in *Noland,* as discussed in footnote 16, the
only reference in the case law applying section 510(c) to the "good faith" defense involves the assertion of
equitable subordination against insiders.  *Lemco Gypsum*, 911 F.2d at 1557 (noting that after a party
seeking equitable subordination of an insider claim presents material evidence of unfair conduct, the insider
claimant can protect its claim from subordination by proving the good faith and fairness of its dealings with
the debtor); *see also Mobile Steel*, 563 F.2d at 701.  In that context, it is raised to refute allegations of
"unfair" conduct by the insider regarding the insider's relationship with the debtor.  The Defendants do not
contend that the "good faith" defense available to insiders under section 510(c) should apply to them.

Bankruptcy Code, entitled "Liability of Transferee of Avoided Transfer," which includes the "good faith" defenses under subsection (b), was not intended by Congress to deal with the equitable subordination of claims under section 510(c) of the Bankruptcy Code. Section 550(a) of the Bankruptcy Code specifically deals with a transfer that is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a). *See* 11 U.S.C § 550(a). Section 550(a) of the Bankruptcy Code also specifically refers to recovered property, or the value of such property, and is specifically meant "for the benefit of the estate." *Id.* Congress did not include section 510(c) among those referenced in section 550(a) because section 510(c) concerns equitable subordination of *claims against the debtor*. The sections referenced in 550(a), and their recoveries for the benefit of the estate, are distinct from the subordination of claims under section 510(c) of the Bankruptcy Code. Section 510(c) of the Bankruptcy Code does not provide any recoveries "for the benefit of the estate," and does not deal with avoidable transfers. The section does not concern property or value that could be recovered "for the benefit of the estate." Had Congress meant to apply the "good faith" defense of section 550(b) to the transfer of claims equitably subordinated by section 510(c), it would have included section 510(c) among the sections referenced in 550(a).

Section 550(b) of the Bankruptcy Code protects a "good faith" transferee from challenges to the propriety of the transfer of the property at issue. It limits the circumstances under which a trustee or debtor in possession could recover property or its value from a purchaser for the benefit of the estate. Its protections do not have any impact on the rights and obligations that may attach to the property. The policy underlying the "good faith" defense, which is to protect certain innocent purchasers from

challenges to the underlying transfer, is not implicated here.  This is because when applying equitable subordination, there is no challenge to a party's rights to the property or to any of the estate's value that was inappropriately taken – the claim still belongs to the transferee.  Instead, the assertion of equitable subordination affects the priority of that claim within a creditor class.  "Subordination of a claim alters the otherwise applicable priority of that claim [within a creditor class]; a subordinated claim receives a distribution only after the claims of other creditors have been satisfied."  5 Collier on Bankruptcy, ¶ 510.01, at 3; *see also Mobile Steel*, 563 F.2d at 699.

Here, the Claims at issue are not the property of the estate.  There is no policy rationale that necessitates protection of a purchaser of a claim, which was never property of the estate, from the risks attendant to a bankruptcy proceeding. This is especially so when such purchaser, by definition, voluntarily enters into such proceeding.  The policy considerations of the "good faith" defense under various provisions of the Bankruptcy Code are not implicated in the claims-transfer process.  Therefore, as stated previously, the extension of the "good faith" defense to the claims-transfer process is not warranted.

Nevertheless, for the sake of completeness, and to amplify the lack of contextual nexus of the "good faith" defense to a transferred claim, the Court will consider the rationale of allowing the Defendants, as transferees of the Claims, to assert the "good faith" defense, analogous to section 550(b), or any other section, of the Bankruptcy Code.

As stated above, the concept of "good faith" was developed by the common law, rather than defined in the Bankruptcy Code.  "Good faith purchaser," also termed "bona fide purchaser" is defined as "[o]ne who buys something for value without notice of another's claim to the property and without actual or constructive notice of any defects in

or infirmities, claims, or equities against the seller's title; one who has in good faith paid

valuable consideration for property without notice of prior adverse claims." BLACK'S

LAW DICTIONARY 1271 (8th ed. 2004).

Section 550(b) of the Bankruptcy Code provides a "good faith" defense to any

immediate or mediate transferee of the initial transferee under subsection (a)(2).  To

determine if the "good faith" defense should be applied by analogy to a transferee of a

claim, the Court will examine each prong of section 550(b) of the Bankruptcy Code to

determine whether the results warrant the relief sought by the Defendants.  The three

elements for the "good faith" defense under subsections of 550(b) of the Bankruptcy

Code are (1) good faith, (2) for value and (3) without knowledge of the voidability of the

transfer.  11 U.S.C. § 550(b).

Courts have applied an objective standard for good faith of a transferee similar to

that applied under section 548(c) of the Bankruptcy Code.  *See* 5 Collier on Bankruptcy,

¶ 550.02, at 23-4.  Courts have found that the transferee does not act in good faith if the

transferee had knowledge of the debtor's unfavorable financial condition at the time of

transfer.  *Id.* (citation omitted).  Courts have further found "a transferee does not act in

good faith when he has sufficient knowledge to place him on inquiry notice of the

debtor's possible insolvency." *Jobin v. McKay (In re M& L Bus. Mach. Co.)*, 84 F.3d

1330, 1336 (10th Cir. 1996) (citing *Brown v. Third Nat'l Bank (In re Sherman)*, 67 F.3d

1348, 1355 (8th Cir. 1995)).

Regarding the third prong under subsection (b)(1) – which concerns having no

knowledge of the voidability of the transfer, courts have found that a subsequent

transferee is not a good faith transferee, if he knew of a debtor's financial difficulties and

the likelihood of bankruptcy.  Further, such knowledge is sufficient to put such

subsequent transferee on notice.  *See Max Sugarman Funeral Home, Inc. v. A.D.B.*

*Investors*, 926 F.2d 1248, 1257 (1st Cir. 1991) (holding that the transferee was not a good

faith transferee because he knew of the chance of voidability due to the entity's

unmanageable indebtedness and the likelihood of bankruptcy). S*ee also Kendall v.*

*Sorani, et al.* (*In re Richmond Produce Co.),* 195 B.R. 455, 464 (N.D. Cal. 1996)

(holding that a transferee is sufficiently put on notice if he knew of a debtor's financial

difficulties and its recent buyout of debtor was highly leveraged).

Moreover, when one examines the elements of the defense, it does not protect a

purchaser who either knows or should have known[19] of potential challenges to a

transferor's right to the property at issue vis-á-vis a prior transferor.  Thus, the criteria for

determining whether a transferee acted in good faith in the purchase of the claims does

not solely rely upon such transferee's actual knowledge of whether the claims would be

challenged by litigations arising from causes of action, such as equitable subordination.

Instead, the premise established by case law under section 550(b) of the Bankruptcy Code

is (1) the transferee's knowledge of the debtor's possible insolvency or unfavorable

financial condition at the time of the transfer, or (2) notice that the transfer may be

recovered by the trustee.

As stated previously, a purchaser of a claim, by definition, knows that it is

purchasing a claim against a debtor and is on notice that any defense or right of the

debtor, including equitable subordination, may be asserted against that claim.  Further, as

---

[19] Courts construe "knowledge" by examining ". . . what the transferee objectively 'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint."  *Jobin,* 84 F.3d at 1336 (citations omitted).  Bankruptcy courts have also held that a transferee who reasonably should have known of a debtor's insolvency is not entitled to the "good faith" defense under section 548(c) of the Bankruptcy Code.  *Id.* (citations omitted).

discussed previously, the Defendants knew or should have known the risks associated

with the purchase of a debtor's distressed debt.  For example, the Defendants knew or

should have known that Enron, as a debtor in possession, is under a fiduciary obligation

to ensure a just and fair distribution to the creditors and, therefore, is obliged to

investigate each filed proof of claim in order to determine whether there is any issue,

including equitable subordination, that should be raised regarding the Claims.[20]

The Defendants argue, however, that they had no knowledge that the Claims

would be challenged under the doctrine of equitable subordination because their purchase

was made more than one year before the Megacomplaint Proceeding was filed.

Nonetheless, the fact that Enron sought equitable subordination *more than one year* after

the Defendants' purchase of the Claims cannot alter the result that a purchaser of a claim

assumes the risks attendant to a bankruptcy proceeding.  This is because the purchaser

has knowledge that it is purchasing a claim against a debtor and it is on notice that the

debtor may assert any defense or right to challenge that claim including, among other

things, its priority within a class (equitable subordination).  Therefore, to the extent that

such challenge would not be time-barred against the transferor, there is no basis to

provide a time-bar defense to a transferee that would not be available to the transferor.

The knowledge that a trustee or debtor in possession will examine a claim is not

speculative or hypothetical.  By contrast, in raising a section 550(b) defense, a transferee

would argue, among other things, that it had no knowledge of any alleged wrongful

conduct regarding the transaction as between the debtor and the transferor.  If such

transferee knew that a fiduciary was going to investigate the "voidability" of the

---

[20] *See* Supra, n. 12.

transaction, it would appear to the Court that such knowledge would be sufficient to defeat the defense.  If a transferee were aware of the potential for an investigation, the possibility of the voidability of the transfer would hardly be hypothetical or speculative. Returning to consideration of a claim, while the knowledge that the obligation of a trustee or debtor in possession to investigate matters related to claims against the estate does not equate to specific knowledge of any wrongful conduct on the part of the transferor of a claim as against the debtor, nevertheless, it is hardly speculative or hypothetical that such wrongful conduct may be alleged following the investigation.

As discussed previously, the section 550(b) transferee lacks good faith in circumstances where the transferee had knowledge of the debtor's unfavorable financial condition or bankruptcy filing at the time of transfer, or information that an investigation of the underlying transaction would take place.  Thus, the Court concludes that even if section 550(b) of the Bankruptcy Code applied by analogy, a claim transferee could not establish that it was merely speculative or hypothetic that an action might be commenced regarding the transferred claim.  The transferee could not establish that it "took" without knowledge or notice that an action might be brought against the claim.  Therefore, such defense would have to fail.

In addition, under section 550(b) of the Bankruptcy Code, "the 'value' required to be paid by the transferee is merely consideration sufficient to support a simple contract . . . .  There is no requirement that the value given by the transferee be a reasonable or fair equivalent."   5 Collier on Bankruptcy, ¶ 550.03, at 22 n. 1 (citations omitted).  Implicit in the "value" requirement of section 550(b) of the Bankruptcy Code is that the value paid is determined without knowledge of the potential voidability of the transfer of the

50

property. By contrast, in the claims-transfer market, the possibility of equitable

subordination of a claim is not purely speculative or hypothetical. The value of a claim is

set by the marketplace's view of the attendant risks, including equitable subordination, in

the bankruptcy process. In a bankruptcy proceeding, the claims purchaser must decide

whether the value is justified based upon, among other things, the perceived risks of

payment. Thus, the value paid for a claim in the marketplace has already taken into

account the bankruptcy risks either by discount, indemnification or both. Consequently,

immunizing a transferred claim from subordination would alter risk factors associated

with the claim and would artificially enhance its value in the claims-transfer market.

Lastly, Congress made it clear under section 550(b) of the Bankruptcy Code, the

transferee must be a good faith transferee to qualify for the exemption. *See* House Report

No. 95-595, 95th Cong., 1st Sess. 375-76 (1977); Senate Report No. 95-989, 95th Cong.,

2d Sess. 90 (1978), *see also* 5 Collier on Bankruptcy, ¶ 550.03, at 25, n.20. The "good

faith" defense in subsections (b)(2) is designed to "prevent a transferee from whom the

trustee could recover from transferring the recoverable property to an innocent transferee,

and receiving a retransfer from him, that is, 'washing' the transaction through an innocent

third party." *Id.* at 23-24. The Court has found that the Defendants cannot establish the

three elements to qualify for the "good faith" defense. As a result, the exemption would

be contrary to congressional policy that prevents a prior transferor from "washing" the

transaction through an innocent third party.

Therefore, there is no basis in law or equity to expand the "good faith" defense

provisions of the Bankruptcy Code or common law to the purchaser of claims and to

thereby exempt that purchaser from the relief sought by a trustee or debtor in possession

based on equitable subordination. Based upon the above analysis, even by analogy, the "good faith" defense under section 550(b) of the Bankruptcy Code is not applicable in the context of equitable subordination asserted by the Defendants herein. Thus, the Court concludes that equitable subordination of the Claims is not inconsistent with the policy that affords a good faith purchaser protection under the Bankruptcy Code. Further, the Court finds that equitable subordination of the Claims is not contrary to any policy underlying any provisions of the Bankruptcy Code.

## CONCLUSION

The Court rejects the Defendants' contention that the bank-loan claims, which were transferred by the original holder of the claims who is alleged to have engaged in certain inequitable conduct, cannot be subject to subordination under section 510(c) of the Bankruptcy Code in the hands of a transferee. Instead, the Court concludes that (1) equitable subordination applies broadly to potentially reach any claims held by a claimant, limited only by the amount of damages stemming from the inequitable conduct that is not otherwise fully compensated to the injured creditor class, (2) the transfer of a claim subject to equitable subordination does not free such claim from subordination in the hands of a transferee. Rather, a claim in the hands of a transferee, either as an initial transferee or a subsequent transferee, who received that claim from a transferor found to have engaged in inequitable conduct is subject to the same equitable relief against the claim, as if, such claim was still held by the transferor. The remedy of equitable subordination remains with the claim, and (3) the "good faith" defense, as asserted by Defendants, is not available to a purchaser of claims.

Assuming as true all of the material allegations in Enron's Complaint, section 510(c) of the Bankruptcy Code, as a matter of law, would not immunize the transferees from subordination in connection with the alleged misconduct of Fleet.  As the Defendants sought dismissal based upon the application of section 510(c) of the Bankruptcy Code, dismissal of the first cause of action is not warranted.  Therefore, the Defendants' motion to dismiss on the first cause of action in this adversary proceeding is denied.

Counsel for the Debtors is to settle an order consistent with this Court's Opinion.

Dated: New York, New York
       November 17, 2005

_ s/ Arthur J. Gonzalez_
UNITED STATES BANKRUPTCY JUDGE